IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS


TIMOTHY L. HOLLOWAY,

            **Plaintiff,**

v.                                        **Civil Action No. 2:17-CV-74**
                                                    **(JUDGE BAILEY)**

JOE COAKLEY, Warden,
USP Hazleton, et al.

            **Defendants.**


## REPORT AND RECOMMENDATION

    This matter is before the undersigned pursuant to Plaintiff's "Motion for Temporary Restraining Order, Preliminary Injunction, and Sanctions" filed November 8, 2017. (ECF No. 85). Plaintiff moved the Court for 1) a temporary restraining order enjoining Plaintiff's transfer to a SMU, 2) a hearing on his Motion for Preliminary Injunction as soon as is practicable, and 3) sanctions on Defendants for violation of the notice requirement. Id. A hearing on the motion was held before the undersigned on November 20, 2017, at which time a ruling was held in abeyance to permit the parties to file supplemental briefings. Subsequently, the Government filed its response on November 29, 2017 (ECF No. 104), and Plaintiff filed his reply on December 6, 2017. (ECF No. 105). The matter now being fully heard and fully briefed, the undersigned issues this Report and Recommendation to the District Judge.

## I.    RELEVANT HISTORY

    This matter dates back to June 29, 2015, when an assault took place at United States Penitentiary Hazleton ("USP Hazleton"). The security footage showed inmate Springer entering Cell 208 at 12:27 p.m. with no apparent injuries. (ECF No. 54-1 at 4). At 1:45 p.m., Plaintiff and

inmates Sparks and Lighthill were seen entering Cell 208. Id. At 1:53 p.m., inmate Cox was seen entering cell 208. Id. At 2:06 p.m., Plaintiff, Sparks, Lighthill, and Cox are seen exiting cell 208. (ECF No. 54-1 at 2). At 2:07 p.m., inmate Springer was seen exiting cell 208 appearing to be injured. Id. Springer was subsequently determined to have sustained injuries to his head and back. Id. Although the report specified that no injuries were sustained by Plaintiff, inmate Lighthill, or inmate Sparks, the report was silent as to whether inmate Cox had any injuries in this incident. Id. at 3.

Following the assault, Plaintiff and the other inmates were all detained in the Special Housing Unit ("SHU") of USP Hazleton for about five months. No disciplinary hearing was held at that time. An Inmate Investigate Report issued in October 2015 concluded that the inmates, including Plaintiff, could all be "return[ed] to general population pending prosecution without further disruption to institutional operations." (ECF No. 104-1 at 59). In November 2015, all five inmates – including Plaintiff – were released from the SHU and returned to general population pending continued investigation and potential charges. Plaintiff remained in general population from November 2015 until June 8, 2016.

On February 18, 2016, the undersigned received an Appointment of Counsel request letter from Assistant United States Attorney ("AUSA") Andrew Cogar. Cogar advised that the Federal Bureau of Prisons Special Investigative Services ("SIS") had referred the incident to the Government for prosecution. Cogar indicated that it may be appropriate to indict five inmates - Cox, Plaintiff, Lighthill, Sparks, and Wooliver - on aiding and abetting assault with serious bodily injury in violation of 18 U.S.C. § 113(a)(6). However, it was requested that the five inmates be appointed counsel so that resolution by plea agreement could be explored first. On February 22, 2016, CJA panel attorney Deanna Pennington, Esq. was appointed to represent

Plaintiff. A global plea agreement was offered to all of the defendants, which Plaintiff declined to accept. It appears that all other inmates excepting Plaintiff were willing to accept the global plea offer.

On June 8, 2016, a routine search of the cell Plaintiff shared with inmate Dawson was conducted, and yellow zip ties – a contraband item – were found in a locker. (ECF No. 20 at 5). Plaintiff and Dawson were both admitted to Administrative Detention in the SHU pending a hearing for violation of Bureau regulations. (ECF No. 20 at 6). Following a hearing, a Disciplinary Hearing Officer (DHO) found Dawson guilty of the incident because he admitted to possessing the zip ties and they were found in Dawson's locker. (ECF No. 27 at 2). Plaintiff was found not guilty, and these charges against him dismissed. Id. The following week, Dawson was released from the SHU back into general population, but Plaintiff remained in the SHU. (ECF No. 27 at 2-3). Plaintiff was told that he would continue to be held in the SHU because of the "pending charges for [June 29, 2015] assault." Id.

On February 23, 2017, the undersigned received a letter Plaintiff had written to AUSA Cogar indicating that "Ms. Pennington [was] no longer [his] attorney," and instructing the United States Attorney's Office to either deal directly with Plaintiff or appoint Plaintiff new counsel. (ECF No. 14). Subsequently, on March 6, 2017, the undersigned received a letter Plaintiff had written to the Court elaborating on his reasons for refusing to work with Attorney Pennington any longer. (ECF No. 15). In his letter, which was construed as a motion to appoint new counsel, Plaintiff elaborated on his reasons for same. Plaintiff explained that when he first met with Pennington, she presented a plea deal from the Government and told Plaintiff that AUSA Cogar had "offered to grease the wheels for [Plaintiff] to be [released from the SHU and] placed back in [general] population if [he] would accept the [plea] deal." Id. Feeling that it was an unfair

tactic to be held in the SHU indefinitely until he accepted the Government's plea deal, Plaintiff asked Pennington to "address[] this court . . . regarding [why Plaintiff was being held indefinitely in the SHU]," but she had failed to do anything about it. Id. In the interim, Plaintiff attempted to get answers from USP Hazleton. Plaintiff was told by SIS Howell that he was not being held in the SHU per USP Hazleton, but rather per "someone at the Federal Building" who he had made "very mad" by refusing to accept the global plea agreement as offered to all defendants. Id. Plaintiff asserted that the AUSA "knows he can drag this out for many months but once I'm indicted the clock starts. There is no justice in what he's doing, [and] my attorney goes right along with him." Id.

Following the hearing, Plaintiff was appointed new counsel for the criminal matter. (ECF No. 7). However, Plaintiff subsequently filed a motion to reconsider, asking to represent himself. (ECF No. 16). A hearing on the motion was held on April 20, 2017, attended by Plaintiff, Plaintiff's then-counsel in the criminal case, Darrell Ringer, Esq. and the Government by Assistant United States Attorney Traci Cook. Although Plaintiff's general ability to represent himself did not appear to be at issue, the undersigned had concerns about Plaintiff's ability to properly represent himself while housed in the SHU, where he could not receive phone calls and had been denied access to legal materials. As a result, the undersigned attempted to ascertain why precisely Plaintiff was being held in the SHU, and when his release from the SHU was anticipated.

Plaintiff reiterated at the hearing that he was being held indefinitely in the SHU as a result his refusal to accept the Government's plea offer regarding the June 2015 assault. Plaintiff stated that because no charging document had been filed in his criminal case, the investigation could remain "pending" indefinitely, and he could thus be detained in the SHU indefinitely.

AUSA Cook informed the undersigned that the Government had already made an inquiry to USP Hazleton on the matter, and were told that Defendant was placed in the SHU for reasons independent of the assault investigation. However, because that was insufficient for the undersigned to determine for what reason Plaintiff *was* being held in the SHU, and for how long, Attorney Ringer and AUSA Cook were both ordered to obtain documentation of same and provide it to the Court within seven days.

In response, the Government submitted a memorandum written by SIS Lieutenant Eric Howell, which consisted of two sentences:

> Inmate Holloway . . . is currently assigned to the [SHU] in [USP] Hazleton, WV. Holloway's current placement in SHU is not related to his pending case with the US Attorney's Office, which occurred on June 29, 2015 at USP Hazleton.

(ECF No. 17). Howell's memorandum thus contained no information useful to the inquiry beyond what had already been represented to this Court. After informing the AUSA that SIS Howell's memorandum was unresponsive to the undersigned's Order, the undersigned subsequently received a faxed copy of an Administrative Detention Order (form BP-S308.052) dated June 15, 2016 which stated that Plaintiff was admitted to Administrative Detention "pending SIS Investigation for Escape Risk." (ECF No. 18). This, too, was unresponsive as 1) that order was a year old, and 2) that investigation had concluded many months ago with Plaintiff being found not guilty of the charges.

Plaintiff's then-standby counsel Ringer submitted a letter from Warden Coakley on May 5, 2017, stating that:

> Our review of this matter reveals Mr. Holloway was placed in the Special Housing Unit (SHU) as an escape risk after [zip ties] were found in this cell that could be used to facilitate an escape. He is also pending prosecution for a serious assault in 2015. Once his legal case is completed, he will be transferred to another facility.

(ECF No. 1 at 15). On May 26, 2017, Ringer wrote to Plaintiff advising that the Government had decided not to pursue criminal charges as a result of the June 2015 incident. (ECF No. 93 at 9). On June 19, 2017, Plaintiff was told by Defendant Jones that the disciplinary write up regarding the assault "had been expunged from Plaintiff's record." Id. A few days later, Plaintiff was told by Officer Whetstone that the Disciplinary Hearing Officer was dismissing the institution-level charges. Id. However, the matter was not resolved.

On June 23, 2017, Whetstone informed Plaintiff that Defendant Jones was referring Plaintiff for transfer to the SMU ("Special Management Unit") at USP Lewisburg in Pennsylvania. (ECF No. 93 at 9). On June 27, 2017, Plaintiff was given a copy of the incident report on the June 2015 assault. Id.  On July 12, 2017, a Disciplinary Hearing Officer ("DHO") held a hearing on the assault charges. (ECF No. 54-1). Plaintiff denied the charges and stated "not guilty." Id. Evidence consisted of memorandums from various correctional officers, clinical records of the inmates, and digital photographs. Id. No witnesses were called and no confidential information was used that was not revealed to Plaintiff. Id. at 4. The DHO noted that Plaintiff was seen entering and exiting inmate Springer's cell along with the other inmates, and found Plaintiff guilty. Id. The DHO sentenced Plaintiff to seven (7) days of disciplinary segregation and one year's loss of commissary privileges. Id at 2. Plaintiff was provided with appeal forms by the DHO, and his appeal of this order was, at last report, pending at the highest level of review at the BOP Central Office. (ECF No. 93 at 10).

However, instead of being released after the seven (7) day disciplinary segregation sentence concluded, Plaintiff continued to be held in the SHU, where he remains to this day. (ECF No. 93 at 10). In addition to his continued detention in the SHU, Plaintiff has now been approved for transfer to the SMU. (ECF No. 96). Defendant's continued detention in the SHU at

USP Hazleton and his impending SMU transfer form the basis of Plaintiff's civil case now before the Court.

## II.         THE PARTIES' CONTENTIONS

Plaintiff moved the court, in relevant part, for a 1) temporary restraining order enjoining his transfer to the SMU until a hearing could be held, (ECF No. 85), 2) a preliminary injunction enjoining his transfer to a SMU during the pendency of this case, (ECF No. 57), and 3) sanctions against Defendants for violation of the joint notice requirement. (ECF No. 85).

In their response, Defendants argue that Plaintiff has no constitutionally protected right to remain at USP Hazleton, and that courts have typically declined to interfere with the BOP's extensive discretion to transfer inmates. (ECF No. 86). In a supplemental response, Defendants further argued that a Bivens action does not authorize injunctive relief; only monetary damages; therefore, even if Plaintiff was transferred, he would not be prevented from seeking monetary damages. (ECF No. 104 at 10). Accordingly, Defendants argue that Plaintiff has not shown he will suffer actual, imminent and irreparable harm if injunctive relief is not granted, Id., and he is not likely to prevail on the merits. Id. at 15.

In his reply, Plaintiff argued that his Amended Complaint specifically states that 1) his claims were brought under both Bivens _and_ federal question jurisdiction; 2) he was suing Defendants in official capacities only relative to injunctive and declaratory relief, but in individual capacities for monetary damages; 3) he seeks declaratory and injunctive relief, but separately also monetary damages, for a) retaliation after exercising his Sixth Amendment right to trial and b) violation of his Fifth Amendment due process rights. (ECF No. 105 at 5-6).

As to Defendant's claim that injunctive relief is unavailable, Plaintiff points out that 5 U.S.C. § 702 expressly provides for such relief; moreover, it has been applied to suits for

injunctive relief against BOP employees. (ECF No. 105 at 6). Thus, Plaintiff argues, his claim is in fact cognizable and properly before this Court. In addition, Plaintiff argues that the balance of harms weighs clearly in his favor. Id. at 8-9. Lastly, Plaintiff points out that documents attached by Defendants to their response brief confirm that Plaintiff's disciplinary history at USP Hazleton has in fact been scant, contradicting Defendants' claims that there are non-retaliatory bases for Plaintiff's SMU referral. Id. at 10. Accordingly, Plaintiff argues there is a likelihood of his success on the merits.

## III.   ANALYSIS

First, as to the legal issues raised by Defendants, Plaintiff's requests for injunctive relief are cognizable and authorized against Defendants by 5 U.S.C. § 702, which operates as "a general waiver of the government's sovereign immunity from injunctive relief." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, *1233 (10th Cir. 2005) (internal citation omitted). Second, while Plaintiff has no constitutionally-protected right to remain or be housed at any specific facility, as Defendants argue, that is not in dispute. (ECF No. 105 at 7). Rather, Plaintiff has a constitutionally-protected right to avoid retaliatory assignment to a Special Management Unit ("SMU") for exercise of his constitutional rights. Wilkinson v. Austin, 545 U.S. 209, *223, 125 S.Ct. 2384, *2394, 162 L.Ed.2d 174 (2005) (Inmates have a due process protected liberty interest in avoiding assignment to correctional conditions that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.").[1] Thus, although

---

[1] Although previously there have been attempts to distinguish SMUs from "supermax" facilities based on those designations, that is a distinction without a difference. Rather, the question is whether the *conditions*, not the label applied to the facility, are "exceptionally more onerous," with supermax being one example of such conditions. Evans v. Federal Bureau of Prisons, 2006 WL 1515617, at *1 (W.D. Va. May 26, 2006) ("An inmate does not have a liberty interest in being housed at a particular institution or in avoiding isolation or separation from the general prison population unless the proposed transfer will subject the inmate to exceptionally more onerous living conditions, such as those experienced by inmates at a 'Supermax facility.'"). Evidence suggests that SMU

courts typically are reluctant to interfere in the BOP's management of their prisoners, the courts can - and on occasion do - intervene when constitutional violations are occurring.

### 1. A Temporary Restraining Order Is No Longer Appropriate Now That A Hearing Has Been Held.

Federal Rule of Civil Procedure 65(b) authorizes the Court, in relevant part, to issue a temporary restraining order without notice to an adverse party when specific facts clearly show immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and the movant's attorney certifies in writing reasons why notice should not be required. Fed. R. Civ. P. (65)(b)(1). Temporary restraining orders are expressly authorized in civil actions involving prison conditions. 18 U.S.C. § 3626(a)(2).

Although Plaintiff's motion for a temporary restraining order was timely when it was filed, the Court was subsequently able to hold a hearing on the matter before it became necessary to enter one. In addition, the parties were able to file supplemental briefings and have been fully heard on the matter. A temporary restraining order "should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, *439, 94 S. Ct. 1113, **1124, 39 L.Ed. 2d 435 (1974). Accordingly, because the appropriate time for issuance of a temporary restraining order

---

Lewisburg is not only equivalent to ADX Florence, the country's remaining supermax facility, but has been described by inmates who have been to both as being worse in actuality:

> A kind of relief came to Richardson in September 2012, when he was transferred out of Lewisburg to the supermax prison in Florence, Colo., the highest-security prison in the country. There, inmates are locked down in a single cell for almost 24 hours a day.
>
> Though Florence has been called "America's Toughest Prison," for many in Lewisburg's SMU, it's seen as an escape. At Florence, they can live alone, free from the constant threat of violence.
>
> As Richardson wrote in a letter to Sprout, "anywhere is a better place to be [than Lewisburg]."

Christie Thompson and Joseph Shapiro, *Inside Lewisburg Prison: A Choice Between A Violent Cellmate or Shackles*. NATIONAL PUBLIC RADIO (October 26, 2016), https://www.npr.org/2016/10/26/498582706/inside-lewisburg-prison-a-choice-between-a-violent-cellmate-or-shackles

has passed, the undersigned now considers a preliminary injunction as to Plaintiff's impending transfer.

### 2. A Preliminary Injunction Preventing Plaintiff's Transfer Pending Resolution Of His Civil Case Is Appropriate Under These Circumstances.

Prospective and preliminary injunctive relief are expressly authorized in civil actions with respect to prison conditions that violate the Federal rights of inmates. 18 U.S.C. § 3626(a)(2). "Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." Id. In fashioning relief, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." Id.

A plaintiff seeking a preliminary injunction must establish 1) that he is likely to succeed on the merits, 2) that he is likely to suffer irreparable harm in the absence of preliminary relief, 3) that the balance of equities tips in his favor, and 4) that an injunction is in the public interest. Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, *20, 129 S.Ct. 365, **375 (2008).

### a. Plaintiff Appears Likely to Succeed on the Merits

Although this case is in relative procedural infancy, the undersigned finds that Plaintiff appears to have a likelihood of success on the merits with what is known to the Court at this time. Plaintiff has alleged facts to support violations of his civil and constitutional rights which are supported by evidence received by the Court over the course of this matter – not only in the nine months that this civil case has been ongoing, but dating back to February 2016 in Plaintiff's prior criminal case (since abandoned by the Government). The documents received to date provide support for Plaintiff's claims, while tending to casting doubt on Defendants' claims.

10

Moreover, Defendants' evidence is inconsistent and conflicting, leading the undersigned to be unable to afford them any significant weight as it pertains to some of Defendants' claims.[2] These discrepancies do not inspire confidence in the truth of the assertions contained in Defendant's evidence as a whole. However, the fact that these discrepancies exist *is* consistent with Plaintiff's claims of pretext and retaliation. Evidence at this point thus suggests that Plaintiff has a likelihood of prevailing.

Moreover, the undersigned is satisfied that Plaintiff has exhausted the administrative remedies available to him at this time, as to transfer specifically. Prisoners are required under the Prison Litigation Reform Act ("PLRA") to properly exhaust available administrative remedies

---

[2] Some of the "declarations" and letters provided by various USP personnel directly contradict themselves, each other, and/or official BOP forms and documentation. For example, SIS Howell's April 20, 2017 letter states that Plaintiff was not being held in the SHU as a result of the pending assault investigation, but Warden Coakley's May 5, 2017 letter cites the investigation as one of two reasons for his detention in the SHU. (ECF No. 1 at 15). Howell's November 28, 2017 declaration stated that Plaintiff was an escape risk in part because zip ties were discovered in his cell, when in fact Plaintiff's cell mate was found responsible for that incident and Plaintiff was cleared of any wrongdoing over a year prior to Howell's declaration. (ECF No. 104-4 at 2). Howell also declared that Plaintiff "has demonstrated consistently disruptive behavior throughout the time that he has been incarcerated at USP Hazelton" which caused his segregation in the SHU. Id. However, Howell also served as Investigator into the June 2015 assault, where he wrote in the Inmate Investigative Report that he "belie[ved that] Holloway can return to general population pending prosecution without further disruption to institutional operations." (ECF No. 104-1 at 59).

For another example, Defendants filed a Declaration of Daniel Jones, Plaintiff's Unit Manager at USP Hazelton, in which Jones declared that Plaintiff "ha[d] become influential with several gangs." (ECF No. 61-1 at 6). A Declaration by Eric Howell likewise stated that Plaintiff had become "affiliated with certain gangs." Yet, both Warden Coakley's Special Management Unit Request, as well as DHO Michael Facey's notice of hearing both stated that Plaintiff has "no Security Threat Group [i.e., gang] Assignment." ECF No. 104-1, Attachment D; ECF No. 85-1 at 2). Regardless of which is correct, the inconsistencies do not aid Defendants' credibility. Moreover, to the extent that Jones and Howell appear to be referencing an incident report from May 2, 2016, the details in that report are decidedly underwhelming. To summarize, a group of inmates discovered that an inmate had cooperated with federal authorities – a fact that would cause most inmates to dislike him. That inmate was warned (prior to any harm befalling him) that he could avoid being beaten up by not returning to General Population after "chow." USP Hazelton personnel consulted Plaintiff to determine whether that was true, and Plaintiff confirmed that it was. The undersigned has struggled to find anything in this incident report that fairly suggests Plaintiff himself was stating anything more than the obvious. The report does not suggest that Plaintiff himself was articulating any personal threat; but rather, reporting the attitudes and intentions of inmates generally as he was asked to do.

Though Defendants' counsel has repeatedly represented to this Court that Plaintiff's transfer to a SMU was not certain until the referral being approved, which did not occur until November 2017, Warden Coakley's letter plainly stated in May of 2017 that "once [Plaintiff's] legal case is completed, he will be transferred to another facility." (ECF No. 1 at 15). The United States Attorney's Office likewise informed this Court in an April 21, 2017 email after consulting USP Hazelton that Plaintiff "is in Administrative Detention until further order . . . and [it is] anticipate[d that] Mr. Holloway will be moved to a SMU, i.e. super-max, after completion of our case." Coakley, Howell, and Jones are all named Defendants in this case.

prior to filing an action relating to prison life. 42 U.S.C. § 1997e(a). Proper exhaustion ordinarily means "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issue on the merits)." Woodford v. Ngo, 548 U.S. 81, *91, 126 S.Ct. 2378, *2386, 165 L.Ed.2d 368 (2006). However, a prisoner cannot exhaust an administrative remedy that is withheld from him by his custodians, and thus not "available" under the meaning of the PLRA. Hill v. Haynes, 380 Fed.Appx. 268, *270 (4th Cir. 2010) ("when prison officials prevent inmates from using the administrative process . . . , the process that exists on paper becomes unavailable in reality.") (internal citation omitted).

While the parties were not unclear as to the exact process for appealing a designation to a SMU at the November 20, 2017 hearing, BOP Policies provide that Plaintiff may challenge his transfer, but an appeal would proceed after Plaintiff had already been transferred:

> Post-Decision Notice and Appeal. The inmate's copy of the completed Report is sent to the referring Warden, who ensures delivery to the inmate. The Report advises the inmate of the opportunity to appeal the decision and the Hearing Administrator's findings through the Administrative Remedy Program, directly to the Office of General Counsel. **An inmate's appeal of the decision or the Hearing Administrator's findings does not delay designation and transfer to a SMU. Designation and transfer are effected; the inmate may proceed with the appeal while housed in the SMU.**

BOP P5217.02(3)(b)(1)(d). As a result, as to transfer specifically, administrative remedies are not available to Plaintiff now, and will not be available until after the harm has already occurred.

### b. The Harm Plaintiff Stands To Suffer If Injunctive Relief Is Not Granted Is Likely, Irreparable And Substantial.

This is not a close call. As outlined in Plaintiff's motion and repeated throughout this docket – indeed, this is the central issue driving this civil suit – the harm Plaintiff stands to suffer if a preliminary injunction is not granted is likely, irreparable, and substantial, in its various aspects. That is, Plaintiff stands to suffer multiple kinds of harm – further impediment of his

ability to confer with counsel and litigate his case in any meaningful way,[3] continued violation of his constitutional rights, and the substantial likelihood of imminent, serious physical and mental harms.

Plaintiff has obtained counsel who is willing to represent him in this matter, despite his indigency; but said counsel does not have the capability to travel approximately six hours one way to attempt to meet with her client if he is transferred. (ECF No. 57). There is no assurance he would be able to obtain new counsel if he were transferred. Moreover, Defendants actions have made counsel practically necessary, given that Defendants have refused to allow Plaintiff to access to legal materials and adequate communication while housed in the SHU, and Defendant simply cannot as a practical matter represent himself adequately in this situation.

Defendant's arguments on this point are unavailing. Defendants argue that because BOP Regulations provide that inmates can confer with counsel and can access legal materials, such concerns are unfounded. (ECF No. 104 at 11). However, Defendants' argument is premised, apparently, on an assumption that BOP Regulations, policies, and procedures are always followed. The undersigned is well aware that is not the case. In this case alone, there have been numerous violations of same by USP Hazleton personnel. Given Defendants' own disregard the directives of the applicable regulations and policies, it is incredible that they now argue that applicable regulations and/or BOP policies should provide any assurances.

For example, at a hearing Plaintiff testified that although he is supposed to have access to legal materials, he is only allowed out of his cell for one hour per day (if that); he has signed up to use the computer in hopes that he could do so, but as of that time, had not successfully been

---

[3] This civil case involves complex constitutional law arguments and is likely to involve significant discovery, depositions, etc. It is clear that Plaintiff would not be able to meaningfully litigate this civil case without counsel.

able to access legal materials. At the November 20, 2017 hearing before the undersigned,

Plaintiff explained in response to opposing counsel's inquiry:

> Q:    Have you been asking to go to the law library?
> A:    When you ask to go to the law library there, when you go, they'll send two officers in your cell to destroy everything in there, and there's two-hundred-some people in there that will tell you that. They'll come in there and destroy everything – they'll make you not want to go to the law library. And then when you *do* go out there, the computer don't work half the time, they keep it locked up, and the printer ain't never worked out there. So, that's – they'll break you of wanting to go to the law library, and they'll take everything you got.
> Q:    So in other words, that has made you hesitant to ask for access?
> A:    Very hesitant.
> Q:    So you have not specifically demanded of anybody, "I want to go to the law library"?
> A:    **I've asked twice, and they've done me like that twice, and then when – the other times I ask, they tell me it's not working right now.**
> Q:    Okay. I just wanted to be clear about that because that was my understanding – **they didn't see in the logs any entries where you had accessed the law library**.[4]

(emphasis added). BOP records thus are consistent with Plaintiff's assertion that he has had no

successful access to legal materials, per Defendants' counsel, despite the fact that inmates in the

SHU "will receive an opportunity to perform personal legal activities." 28 C.F.R. § 541.31(l);

also incorporated into BOP Program Statement and policy at BOP P5270.10.

Moreover, despite directives that Plaintiff "will receive telephone privileges," 28 C.F.R.

§ 541.31(j), Plaintiff was constructively denied telephone access to his counsel for quite some

time. Plaintiff's counsel has had significant difficulty reaching her client at USP Hazleton which

resulted in delayed filing of the Amended Complaint. (ECF No. 85 at 2) (stating that "numerous

calls have been scheduled and then cancelled or never completed.").[5] Thus, regardless of whether

---

[4] November 20, 2017 motion hearing at 12:29:40-12:30:50, available on internal courtroom recordings.

[5] At the hearing, Plaintiff's counsel indicated that she had left voicemails and did not receive any responses for a number of weeks. She eventually received one return call from one counselor, but that counselor did not get back to counsel with a date for a phone call for a while. They eventually had scheduled a call at 9:30 a.m. one morning, but after waiting for an hour with no call, the receptionist had stepped away from her desk. The late call at 10:30 a.m.

in bad faith or due to mere coincidental extended difficulties, Defendants' own actions have given the undersigned no confidence that regulations and BOP policies will be followed in practice, regardless of whether they are supposed to be followed in theory.

Moreover, the undersigned has little confidence that the BOP Regulations would be followed any more closely at USP Lewisburg, where Defendants seek to transfer Plaintiff. In contradiction to Defendants' claims, this Court has in fact recently held that a civil Plaintiff housed in USP Lewisburg did *not* have adequate access to counsel located in the Northern District of West Virginia for the purpose of conferring with counsel and preparing for proceedings. Hill v. Haynes et al., Civil Action No. 3:06-CV-136, ECF No. 66, 2-3 (May 6, 2011) (Kaull, J.). In that order, the court noted that 28 C.F.R. § 540.13 expressly noted that a Warden "may not apply frequency limitations on inmate telephone calls to attorneys when the inmate demonstrates that communication with attorneys by correspondence, visiting, or normal telephone use is not adequate." Id. at 3. Finding these circumstances constituted good cause,[6] the

---

from Counselor Bennett was thus not answered right away. When counsel returned his call, they rescheduled. There were a number of subsequent occasions where calls were scheduled and never came, and Plaintiff's counsel was later told that the prison was on lockdown or given various other reasons USP Hazleton could not call as scheduled. On another occasion, a call came to counsel's office on a day when she was out of town attending scheduled hearings; on the day they were told to call back, the call never came.

4 To the extent that Defendants suggest that Plaintiff's counsel should have asked for assistance from Defense Counsel or the Mid-Atlantic office in gaining access to her client telephonically at USP Hazleton, that argument only reinforces the fact that USP Hazleton Personnel have evidenced little regard for, or adherence to, regulations and BOP policies. Plaintiff's counsel should be able to speak to her client as provided for in the applicable statutes and regulations, period. 28 U.S.C. § 541.31(j); BOP Program Statement P5270.10, Counsel should not be required to make additional phone calls and enlist persons outside USP Hazleton to act in an oversight capacity and ensure that USP Hazleton staff make Plaintiff accessible to her as they are supposed to, at the designated times and as case preparation requires.

6 "In his petition, counsel asserts that the plaintiff is currently confined at the United States Penitentiary in Lewisburg, Pennsylvania ("USP-Lewisburg") . . . USP-Lewisburg is five to six hours from [counsel's] office in Morgantown, West Virginia. Therefore, counsel has attempted to confer with the plaintiff by telephone in an effort to prepare for the up coming evidentiary hearing. However, the plaintiff is limited to biweekly telephone calls, each [] last[ing] only one hour. Counsel asserts that he has attempted to obtain additional telephone communication in accord with Bureau of Prisons policy, but that the Warden has refused his request. Counsel asserts that two hours a week is not adequately sufficient time for him to prepare for the evidentiary hearing scheduled for June 17, 2011. In additional counsel notes that he has been appointed by the Court and that making in-person visits to the plaintiff

United States Marshals were ordered to transport Hill to the Northern District of West Virginia where he would remain until further order of the Court. Thus, contrary to Defendants' selective citations, the relief Plaintiff requests has in fact been granted before, and to a greater extent than requested by Plaintiff here. Whereas Hill was *removed* from Lewisburg and brought *to* the Northern District pending the resolution of his civil case, Plaintiff simply seeks not to be transferred *out* of the Northern District during the pendency of this case.

Further, the undersigned finds that the harm is beyond speculative at this point. On prior occasions when the Court has considered the issue, no "SMU hearing" (hearing to determine Plaintiff's suitability for transfer to a Special Management Unit) had taken place. However, a SMU hearing was held on November 3, 2017, and Plaintiff has subsequently been completely approved for transfer as of Friday November 17, 2017. (ECF No. 96 at 2). Accordingly, it is now certain that Plaintiff's transfer to a SMU will occur following disposition of his motions, absent any intervention by this Court (a fact that has been confirmed by Defendants' counsel).

In addition to harm Plaintiff stands to suffer by continued violation of his constitutional rights, Plaintiff also will be exposed to a substantial likelihood of physical and/or mental harms by virtue of transfer to the SMU at USP Lewisburg. Defendants' attempts to portray SMUs as "opportunities" for inmates to better themselves, again citing BOP Regulations, once again are entirely unpersuasive. Regulations do not necessarily equal reality. Moreover, the fact that other courts have recited those regulations does not make what the regulations say true, especially when there is ample evidence to the contrary. Plaintiff cites an October 2016 National Public Radio report on USP Lewisburg, well-known known as one of America's worst prisons, in which prison data showed the rate of violence at Lewisburg SMU was "six times higher than all federal

---

would be extremely expensive for the Government . . . It is not cost effective under current[] hourly rates and transportation costs for an attorney to undergo such a trip to meet with a client." Id.

prisons"[7] due to the practices and procedures used there and inadequate provision for mental health treatment. (ECF No. 93 at 10). Moreover, this Court need not rely on news outlets alone on this issue. After a series of investigate reports on the Lewisburg facility aired, the Department of Justice conducted its own investigation in which those allegations were confirmed in a July 2017 DOJ report.[8] It is beyond clear that the harm Plaintiff will be exposed to if transferred is significant. The SMU at USP Lewisburg is thus clearly not a facility to which Plaintiff should be transferred unless and until his claims are fully litigated, especially when the  evidence currently weighs in Plaintiff's favor.

### c.   The Balance Of Harms Tips In Plaintiff's Favor Because The Harm USP Hazleton Stands To Suffer If Granted Is *De Minimis*, If Any.

Defendants argue that they must be free to transfer prisoners in response to safety concerns, medical concerns, and space constraints. (ECF No. 104 at 15). While those may be legitimate concerns for prison administration generally, the undersigned finds none of these arguments persuasive in light of the specific circumstances unique to Plaintiff here. Defendants' actions rather suggest that there is in fact no particular harm in keeping Plaintiff at USP Hazleton for a short while longer.

For example, USP Hazleton has willingly and voluntarily kept Plaintiff housed in the SHU continuously since June 8, 2016 – and, indeed, refused to let him out. Defendants have not explained how USP Hazleton would suffer any harm that they have not willingly subjected themselves to for the past two years by continuing to house Plaintiff there. Defendants have failed to articulate any change in circumstances that would explain why Plaintiff could be kept in

---

[7] Joseph Shapiro and Christie Thompson,  *Solitary Confinement Methods Often Lead to Violence At Lewisburg Prison,* NATIONAL PUBLIC RADIO (October 26, 2016), https://www.npr.org/2016/10/27/499637384/solitary-confinement-methods-often-lead-to-violence-at-lewisburg-prison
[8] Office of the Inspector General, U.S. Department of Justice. *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness.* July 2017. https://oig.justice.gov/reports/2017/e1705.pdf

the SHU previously, but must now be transferred. If USP Hazleton could endure the "harms" they allege for two years while the United States Attorney's Office conducted an investigation, it is unclear why they cannot now just as easily endure the same "harms" while this case is pending before this Court.

Moreover, as Plaintiff points out, if USP Hazleton were truly concerned about space in the SHU, they are always free to release Plaintiff back into general population - just as they did for each of the other inmates who were also "involved" with the assault along with Plaintiff.[9] Indeed, it has yet to be sufficiently shown to the undersigned's satisfaction why Plaintiff is in the SHU at all, given that none of the other inmates involved were so confined. As a result, it is difficult to see what legitimate harm Defendants could suffer if the status quo is maintained. And lastly, as the undersigned explains further below, Plaintiff does not necessarily have to remain housed at USP Hazleton at all in order to remain in the Northern District of West Virginia.

### d.  The Public Interest Would Be Best Served By Granting Plaintiff's Motion

The undersigned finds Plaintiff's arguments on public interest persuasive. Retaining Plaintiff at USP Hazleton does not negatively impact the public interest. Rather, the public interest in this case is best served by facilitating its citizens' right of access to the courts and to counsel, and to ensure that constitutional rights of its citizens are upheld. In addition, the public interest is served by avoiding the burden imposed by twelve-hour round trip distance that would exist between Plaintiff and his counsel if transferred – a burden that not only is prohibitive to Plaintiff's counsel, but even if it could be managed, would be an entirely unnecessary waste of

---

[9] The undersigned has yet to see any compelling evidence to suggest that Plaintiff shares any greater culpability in the assault than any of the other inmates who were present. The DHO's decision was based solely on what the video footage revealed and the reports of the incident. The footage showed four inmates entering Springer's cell, four inmates leaving Springer's cell a short time later, and Springer being injured upon next sighting. While Plaintiff did attempt to take full responsibility, that too is not persuasive evidence that he was more involved than any of the other inmates because, as an inmate serving a life sentence, Plaintiff is ideally situated to bear the punishment.

funds. <u>Hill,</u> Civil Action No. 3:06-CV-136, ECF No. 86 (N.D.W.Va. May 6, 2011) (Kaull, J.). The same would be true of requiring Plaintiff's transport from USP Lewisburg back to the Northern District of West Virginia for pretrial hearings, case preparation, and trial. This would impose a significant burden upon the United States Marshals and unnecessarily drain their resources. In absence of any sincere, legitimate, and compelling reason to do so immediately – which the undersigned has yet to hear[10] – the public interest would appear to be best served by delaying Plaintiff's transfer to a SMU, if that is ultimately upheld, until this case concludes.

> **e. The Relief Plaintiff Requests Is Narrowly Drawn, The Least Intrusive Means Necessary To Correct The Harm, And Imposes No Adverse Impact On Public Safety Or Operations**

Because the relief Plaintiff requests is narrowly drawn, and in fact requires no action whatsoever on the part of Defendants to implement, the undersigned anticipates that maintaining the status quo would not be intrusive at all to Defendants. Moreover, injunctive relief would impose no adverse impact whatsoever that has not already been comfortably maintained by Defendants of their own initiative for approximately two years.

### 3. Plaintiff's Request For Sanctions Is Moot

Plaintiff's third request - for sanctions - must be denied as moot at this time. Although such a request appeared timely and appropriate with what was known to Plaintiff and his Counsel at the time the motion was filed, subsequently it appears that USP Hazleton has not yet violated the notice requirement. However, Plaintiff may renew the motion should circumstances change in the future.

---

[10] Even if Defendants were able to provide compelling reasons why Plaintiff could not remain at USP Hazleton (which they have not yet), Plaintiff's transfer to SMU Lewisburg would not be the only alternative. As in <u>Hill</u>, Plaintiff could potentially be housed in a regional jail or any other facility in this district where the Marshals have housing capabilities. It is therefore not a matter of SHU or Lewisburg SMU only, as Defendants suggest.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that:

1.       Plaintiff's motion for a Temporary Restraining Order be **DENIED** as **MOOT**;

2.       Plaintiff's motion for a Preliminary Injunction (ECF No. 85) be **GRANTED** as to transfer, Defendants be **ENJOINED** from transferring Plaintiff as planned to an SMU, and Plaintiff continue to remain housed at USP Hazleton (or, in the alternative, temporary quarters in the Northern District can be arranged) until this case concludes; and

3.       Plaintiff's motion for sanctions be **DENIED** as moot at this time, while Plaintiff remains free to renew the motion if it becomes appropriate in the future.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk is **DIRECTED** to mail a copy of this Order to Plaintiff (by certified mail, return receipt requested) at his address at USP Hazleton; and provide electronic notice to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: February 7, 2018.**


MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE